Hon. Ricardo S. Martinez

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ARRIVALSTAR S.A. and MELVINO TECHNOLOGIES LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>HAPAG-LLOYD USA, LLC<br><br>Defendant. | Case No. 11-cv-00912 -RSM<br><br>PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS<br><br>NOTE ON MOTION CALENDAR: October 7, 2011<br><br>Oral Argument Requested |

Plaintiffs ArrivalStar S.A. and Melvino Technologies Limited, (collectively "ArrivalStar") by and through their undersigned attorneys, hereby oppose Defendant Hapag-Lloyd's Motion to Dismiss and, in opposition thereto, state as follows:

## BACKGROUND

In its motion, Hapag-Lloyd suggests ArrivalStar is somehow abusing the patent system to extort money from innocent parties, such as (supposedly) itself. This is not the case. In reality, ArrivalStar is the pioneer in developing various systems and methods for facilitating shipping, tracking, package delivery, and notification methods that are now used

Opposition to Motion to Dismiss - 1

**MANN LAW GROUP**
1218 Third Avenue, Suite 1809
Seattle, WA  98101
TELEPHONE:  206.436.0900

by virtually all major and minor businesses engaged in the shipping, forwarding, package delivery, and similar industries.

ArrivalStar owns more than thirty U.S. Patents directed to the technologies it pioneered and that are now widely used in the shipping and freight-forwarding industries. ArrivalStar has successfully licensed its patents to more than one-hundred-twenty businesses, including both major and minor competitors of Hapag-Lloyd. These others – including such competitors as Federal Express and UPS – have accepted licenses under the ArrivalStar patent portfolio. Hapag-Lloyd, however, apparently believes it is somehow exempt from the patent laws of this country.

Through its procedural maneuvering and legal sophistry, Hapag-Lloyd hopes to avoid paying the reasonable royalties it properly owes under the ArrivalStar patents and that its own competitors have already agreed to pay. Hapag-Lloyd's instant motion is without factual or legal merit and is simply a legal maneuver designed to thwart ArrivalStar's efforts and increase the burdens and expenses ArrivalStar faces.

Martin Kelly Jones, the founder of ArrivalStar, is the inventor of the various methods and systems claimed in the ArrivalStar patents. Generally, Mr. Jones' inventions are directed to systems and methods that enable users to receive important vehicle and/or shipment status and arrival information through the use of common communication devices, including, among others, telephones, wireless communication devices, PDAs and PCs. By keeping users more informed about status and arrival information, Mr. Jones' inventions have significantly reduced the downtime traditionally experienced by millions of people every day waiting on the arrival of transportation, cargo and package delivery vehicles. Because the ArrivalStar technology significantly reduces waiting time and dramatically increases

efficiency, it has application in the over-the-road, air, rail and oceangoing transportation markets, as well as the cargo, package delivery and package delivery notification markets. Although through familiarity this may appear old hat today, the fact is that, at the time these technologies were developed by Mr. Jones they were anything but.  Mr. Jones is the man that came up with these ideas and he was rewarded with over thirty patents testifying to that fact. While Hapag-Lloyd now suggests that these matters are somehow beyond the reach of United States patent law, the simple fact is that, to date, no one has been able to demonstrate that Mr. Jones was not the first and true inventor of these important technologies.

ArrivalStar prefers to reach agreements with potential licensees amicably and without resort to litigation, as this is in the economic interest of everyone.  Indeed, ArrivalStar sought such amicable resolution with Hapag-Lloyd, but was forced to sue when Hapag-Lloyd unequivocally declined ArrivalStar's offer of a license.  While the majority of potential licensees ultimately accept a license through negotiation and agreement, ArrivalStar has, from time to time, been forced to initiate formal legal proceedings.  To date, none of these proceedings has resulted in any significant change in the strength of ArrivalStar's patent portfolio.  Hapag-Lloyd's blatant attempt to suggest to this court that ArrivalStar is somehow abusing the system or is otherwise not entitled to enforce its extensive patent portfolio is simply without actual basis.

In this action, ArrivalStar seeks to enforce two of its patents against Hapag-Lloyd.  In prior letters to Hapag-Lloyd, ArrivalStar set out in detail why Hapag-Lloyd needed a license under the ArrivalStar patents and offered a license under very favorable terms.  In addition, ArrivalStar provided Hapag-Lloyd with a so-called "claim chart" outlining with particularity the specific Hapag-Lloyd activities and services believed to be infringing and how those activities and services are covered by one or more of ArrivalStar's patent claims.

This claim chart was, in fact, subsequently included as Exhibit C to the Complaint filed in this action. Although Hapag-Lloyd disingenuously dismisses the claim chart as being, "conclusory," the simple fact is that providing a claim chart is not even needed in order to file a proper action for patent infringement, and ArrivalStar's inclusion of the chart in its initial filing is more than adequate to provide proper "notice" of the nature and basis of ArrivalStar's suit. In short, Hapag-Lloyd has no credible basis for claiming, as it does, that ArrivalStar's Complaint fails to set out a claim for which relief can be granted.

## ARGUMENT

### A. ArrivalStar's Complaint is not "Facially Implausible"

Hapag-Lloyd, at page 4 of its motion, makes the bizarre claim that ArrivalStar's Complaint is "facially implausible." Not only is it not required that any patent plaintiff set out all facts and details supporting its case in the initial complaint, ArrivalStar has gone above and beyond what is ordinarily needed by including a claim chart with its initial complaint outlining not only two of the patent claims believed to be infringed, but also pointing out where each element of the claims is found in the accused Hapag-Lloyd methods. Under this Court's Local Rules, patent plaintiffs are not even required to provide such charts until long after the Complaint is answered, the parties have had their Rule 26(f) conference, and initial disclosures made. Indeed, ArrivalStar provided a preliminary claim chart as part of its Complaint in the now overly-optimistic hope that this would avoid the inevitable Rule 11 accusations and Rule 12 motions that are, unfortunately, becoming routine procedures for patent defendants. Not only is ArrivalStar's case "plausible," ArrivalStar, in its initial pleading, set out precisely how at least two of its patent claims read on Hapag-Lloyd's services. Calling this "conclusory" does not, and cannot change the fact that mapping ArrivalStar's patent claims to the services of Hapag-Lloyd *as described by Hapag-Lloyd itself* not only satisfies the pleading requirements of this Court but makes ArrivalStar's allegations more than "plausible."

Opposition to Motion to Dismiss  - 4

**MANN LAW GROUP**
1218 Third Avenue, Suite 1809
Seattle, WA  98101
TELEPHONE:  206.436.090

The only possible merit to Hapag-Lloyd's motion is that a claim for patent infringement requires a connection to the United States. However, and as shown below, there is a more-than-sufficient connection with the United States to support an infringement action against Hapag-Lloyd, even if Hapag-Lloyd's servers are all located outside the United States. Even if Hapag-Lloyd's servers are located outside the United States, the "product" produced by those servers is indisputably delivered to consumers *within* the United States.

### B.   Hapag-Lloyd Has a Substantial U.S. Presence

According to its own website[1], Hapag-Lloyd is a "leading global liner shipping company" that operates more than 135 modern ships, and moves almost five million containers each year. Hapag-Lloyd employs at least 6,900 motivated people at 300 locations in 114 around the world. This is all networked through an IT system claimed to be the industry leader. In the United States alone, Hapag-Lloyd has at least eight separate offices including one in Seattle. Indeed, by looking out over Elliott Bay, the Court may take judicial notice that Hapag-Lloyd ships are frequent visitors to Seattle and account for a large portion of the containers handled through Seattle and Tacoma.

### C.   Hapag-Lloyd Provides Real-time Data to Customers in the United States

Again, according to its own website, Hapag-Lloyd provides the means for its shipping customers to keep track and up to date with the status of shipments wherever the customers are located.[2] As stated by Hapag-Lloyd itself:

> Our Online Business serves as e-commerce portal and is part of our website. It offers real-time access to your actual transport data, 24 hours / 7 days a week. Once you are registered you will have full access to a broad range of Online Business services along your transport process.

Hapag—Lloyd website:
"http://www.hapag-loyd.com/en/products_and_services/online _business.html"

---

1   Available at "http://www.hapag-lloyd.com/en/about_us/overview.html"
2   See, "http://www.hapag-lloyd.com/en/products_and_services/online_business.html"

Opposition to Motion to Dismiss  - 5

**MANN LAW GROUP**
1218 Third Avenue, Suite 1809
Seattle, WA  98101
TELEPHONE:  206.436.090

This feature described on the Hapag-Lloyd website is available to customers in the United States to enable them to determine, on their own computers and in their own offices, the status of shipments and deliveries they have entrusted to Hapag-Lloyd.  Regardless of where the actual servers are located, there is and can be no dispute that the reports regarding the status of the shipments are provided to U.S customers in the United States while those customers are physically present in the United States.  Indeed, the ability to provide such real-time information to the customers, *where the customers are actually located* is the principal value of the real-time tracking service offered by Hapag-Lloyd.  Again, there can be no serious dispute that this is how Hapag-Lloyd's accused systems operate.[3]

### D.  Hapag-Lloyd's Reports Are a Tangible Product Delivered To Customers in the United States

Attached as Exhibits A-C to the accompanying Declaration of ArrivalStar's undersigned counsel are true and correct sample reports that Hapag-Lloyd itself makes available through its website.  These reports are examples of what Hapag-Lloyd itself tells prospective customers they will be able to obtain and enjoy if they use Hapag-Lloyds "Online Business" service.  These reports, which are indisputably provided to customers on their own computers, are tangible products that provide customized, personal information to the customers regarding the status of that particular customer's shipments, containers, etc.  Such reports can be printed out, saved, emailed to others, etc., by the customers themselves using the customer's own computers and equipment.  Again, this cannot be in serious dispute as Hapag-Lloyd's own website demonstrates these capabilities.

### E.  Hapag-Lloyd's Motion Ignores the Relevant Statute and Law

Hapag-Lloyd bases its motion principally on the Federal Circuit's 2005 holding in *NTP, Inc. v. Research in Motion, Ltd..,* 418 F.3d 1282 (Fed. Cir.2005) and argues that this

---

[3] To the extent Hapag-Lloyd does contest any of this, such should be addressed in a proper motion for summary judgment following meaningful discovery, not by way of an early motion under Rule 12(b)(6).

Opposition to Motion to Dismiss  - 6

**MANN LAW GROUP**
1218 Third Avenue, Suite 1809
Seattle, WA  98101
TELEPHONE:  206.436.090

holding precludes infringement under 35 U.S.C. §271(a).  In particular, Hapag-Lloyd argues that, because its servers are located outside the United States,[4] it cannot, as a matter of law, infringe method claims of a United States patent.  In so doing, Hapag-Lloyd ignores the factual distinctions between the circumstances here and those in *NTP* and further downplays the significance of 35 U.S.C. § 271(g) – a statute that controls under the circumstances here.

Although Hapag-Lloyd marginally addresses and dismisses 35 U.S.C. § 271(g) in a single footnote appearing at page 7 of it motion, 35 U.S.C. § 271(g) is controlling here and precludes dismissal of this action.  Section 271(g) states n no uncertain terms, "Whoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer,..."  Accordingly, even if all the steps of the claimed method are performed outside the United States, infringement of a United States method patent claim still occurs if a "product" made by that patented process is imported, sold, offered for sale or used in the United States.

In the present case, the reports provided by Hapag-Lloyd to its e-commerce customers and that are generated using the ArrivalStar patented methods are a "product" and are imported into and used by customers in the United States.  Accordingly, even if one or more steps of the ArrivalStar patented method are performed by Hapag-Lloyd using servers located out of the United States, infringement still occurs under 35 U.S.C. § 271(g) when reports generated by those servers using the patented method are delivered to customers in the United States.

Although not a principal part of its motion, Hapag-Lloyd will, in its rebuttal, no-doubt argue that section 271(g) is not applicable given the Federal Circuit holdings in *NTP, supra,*

---

[4] Hapag-Lloyd makes this claim unilaterally and states, without proof, that it can provide evidentiary support for this claim.  Be that as it may, ArrivalStar believes that, even if true, this is insufficient to permit dismissal of this action.  Nevertheless, ArrivalStar lacks sufficient information to know whether this claim by Hapag-Lloyd is true and, accordingly, avers that at least some discovery is needed before it can admit or deny this claim or before the Court can accept it as true.

Opposition to Motion to Dismiss  - 7

**MANN LAW GROUP**
1218 Third Avenue, Suite 1809
Seattle, WA  98101
TELEPHONE:  206.436.090

and *Bayer AG v. House Pharm., Inc.,* 340 F.3d 1367 (Fed. Cir. 2003). Each of those cases is factually distinguishable in that, in those cases (and unlike here) it was only information that was conveyed into the United States and not an actual tangible product, such as the reports supplied by Hapag-Lloyd, that were delivered to a customer. Indeed, recent cases, which Hapag-Lloyd inexplicably omits from its motion, hold that providing a data file or report, such as Hapag-Lloyd does here, is precisely the sort of "product" that gives rise to infringement liability under 35 U.S.C. § 271(g), even if the method steps themselves are performed by one or more computer servers located outside the United States.

In *Cnet Networks, Inc. v. Etilize, Inc.,* 528 F.Supp.2d 985 (N.D. Cal., 2007) the District Court distinguished the holdings in *Bayer* and *NTP* and held that electronic product catalogs created and stored on computers located overseas nevertheless infringe method claims under 35 U.S.C. § 271(g) when such electronic catalogs were downloaded to users in the United States. In particular, the court in *Cnet Networks* specifically held that a "data file," such as is transmitted by Hapag-Lloyd here, not only is a "product" within the meaning of 35 U.S.C. § 271(g), but that it is irrelevant that the "product" – namely the electronic catalog at issue there (or the reports delivered here) – exist in electronic rather than paper form. In the words of the Court:

> This court agrees with CNET that *Microsoft* is instructive for the concept that an electronic catalog, like computer software, is not simply an intangible collection of information, but can also be thought of as having a physical, tangible embodiment once it is expressed and stored on computer readable media in the form of magnetic fields on a hard drive or etchings on a CD-ROM. The catalog in this case, therefore, is distinguishable from the abstract information at issue in *Bayer.*
>
> * * *
>
> In other words, the electronic catalog in this case, far from being abstract information or knowledge, is a physical article no different from a product catalog manufactured and assembled on paper bound with stitching, glue or staples. The court holds that the catalog is a "product" within the meaning of section 271(g) which is "made by" CNET's patented processes and is "imported" and "used" in the United States by Etilize and Etilize's customers.

*Id.* at 994

Opposition to Motion to Dismiss  - 8

MANN LAW GROUP
1218 Third Avenue, Suite 1809
Seattle, WA  98101
TELEPHONE:  206.436.090

In distinguishing both *Bayer* and *NTP* and discounting the supposed difference between a paper report and one viewable on a computer, the Court in *Cnet Networks* essentially dismissed the arguments that Hapag-Lloyd will no-doubt make in response to ArrivalStar's arguments here. The decision in *Cnet Networks* is well-reasoned, thorough, and reflects the realities of the modern computer and web-based technologies and practices through which most business is now conducted. It is long past time to put to rest spurious claims that reports, books, musical recordings and the like somehow cease to exist when implemented in electronic form on a computer rather than on paper or vinyl as the case may be. Modern experience and the realities of how the world now works speak otherwise.

Nor can it be claimed that the decision in *Cnet Networks* is some sort of aberration. In *Ormco Corp. v. Align Technology, Inc.,* 609 F.Supp.2d 1057 (C.D. Cal., 2009) the District Court cited *Cnet Networks* with approval and held that:

> The same logic [as in *Cnet Networks*] *applies* to the 3D digital model in this case. Like the catalog in CNET Networks, the 3D digital model is not a mere package of information, but a "creation" produced by "practicing each step" of a patented process. Align attempts to distinguish CNET Networks by noting that, unlike the catalog there, the 3D digital model is not itself bought and sold as a final product. Align Mem. at 11; Align Reply at 13. This argument appears to be irrelevant to the § 271(g) analysis, because the statute does not require a "product" to be sold at all, as it explicitly provides for liability if the product at issue is sold or imported or used.

609 F. Supp. 2D at 1076

Again the reasoning of the court in *Ormco* was sound and the court distinguished the different facts of *NTP* and *Bayer* from those of the instant case. As in both *Ormco* and *Cnet Networks,* the case here involves a report or data file that is created by Hapag-Lloyd using a patented method and thereafter "imported" and/or "used" by customers in the United States. As in both *Ormco* and *Cnet Networks,* the reports at issue themselves constitute "products" within the meaning of 35 U.S.C. § 271(g) and can give rise to liability for paten infringement,

Opposition to Motion to Dismiss  - 9

even if one or more of the individual steps of the patented method are performed by computer servers located outside the United States.

For all the foregoing reasons, the reports generated and provided by Hapag-Lloyd to customers in the United States are properly considered "products" under 35 U.S.C. § 271(g) and the well-reasoned, recent holdings of other courts addressing the issue. The holdings of *NTP* and *Bayer* are distinguishable on their facts in that neither involved directly providing to customers information in a tangible, i.e., human-readable form. Here, there is no dispute that Hapag-Lloyd supplies to customers within the United States, a "product" that is created using the methods protected by ArrivalStar's method patents. Such activities fall squarely within the plain language of 35 U.S.C. § 271(g) and give rise to a cause of action as pleaded in ArrivalStar's Complaint.

### F. Oral Argument, or at the Very Least, Leave to File a Sur-Reply, Should Be Granted

Although Hapag-Lloyd has not directly addressed 35 U.S.C. § 271(g), except obliquely in its footnote 6 of its motion, any arguments that it later makes under *NTP* and *Bayer* in response to this Opposition are ones that could and should have been made earlier. Indeed, given the admissions made in its footnote 6, Hapag-Lloyd was clearly aware that ArrivalStar was relying on 35 U.S.C. § 271(g) and cannot claim "unfair surprise" by the arguments presented by ArrivalStar here. As the party seeking the drastic remedy of outright dismissal of ArrivalStar's entire action, Hapag-Lloyd should have directly and honestly addressed 35 U.S.C. § 271(g) in its initial brief and not obliquely through a footnote in the middle of its brief. As Hapag-Lloyd will, in its Reply, no-doubt discount ArrivalStar's arguments and seek to distinguish the cases on which ArrivalStar relies, any attempt on the part of Hapag-Lloyd to address 35 U.S.C. § 271(g) for the first time in its Reply rather than in its opening brief, deprives ArrivalStar of the opportunity to address the true arguments Hapag-Lloyd will make. For these reasons, oral argument, or at the very least, an opportunity to file a sur-reply, should be granted and afforded to ArrivalStar by this Court.

Opposition to Motion to Dismiss - 10

**MANN LAW GROUP**
1218 Third Avenue, Suite 1809
Seattle, WA 98101
TELEPHONE: 206.436.090

### G. Hapag-Lloyd's Attempt to Limit Discovery Should Not Be Granted

Hapag-Lloyd suggests that, while its motion to dismiss is under consideration, discovery in this case should nevertheless be limited by this Court. In short, Hapag-Lloyd asks that the rules of this Court – rules that other defendants accept without question – should somehow not apply here.

This is an obvious and blatant attempt by Hapag-Lloyd to dispense with the ordinary rules of discovery and allow Hapag-Lloyd to proceed in a piecemeal fashion that permits it to increase the burdens and expenses imposed on ArrivalStar, while prolonging and complicating these proceedings.

The truth of the matter is that ArrivalStar has offered Hapag-Lloyd a license that costs far less than what the costs of litigation in this action are likely to be and that its principal competitors have already agreed to pay. While Hapag-Lloyd is certainly free to challenge ArrivalStar's patents and mount a defense in this action if it legitimately believes ArrivalStar is somehow wrong, for Hapag-Lloyd to solicit the Court's indulgence and grant it special dispensation in the form of relieving it of the discovery obigations other litigants face, is to go too far.

ArrivalStar has tried to deal with Hapag-Lloyd amicably and without litigation only to be sent packing in no uncerctain terms. Having been forced to solicit the help of the courts, ArrivalStar is now presented with an ill-considered Motion to Dismiss that lacks substantial basis in law or fact. Having thrown up an unecessary and needless motion, Hapag-Lloyd then asks that the ordinary rules of litigation pertaining to discovery somehow not apply to itself. Why the rules that apply to everyone else should somehow not apply to Hapag-Lloyd has not been explained. For these reasons, Hapag-Lloyd's request that discovery be limited in this action should not be granted.

## CONCLUSION

For all the foregoing reasons, Hapag-Lloyd's motion to dismiss is without legal or factual foundation and should be denied in its entirety. Such action by this Court is respectfully requested.

Dated this 3rd day October, 2011.

                Respectfully submitted,

/*Philip P. Mann*
Philip P. Mann, WSBA No: 28860
MANN LAW GROUP
Seattle Tower
1218 Third Avenue, Suite 1809
Seattle, Washington  98101
(206) 436-0900
Fax (866) 341-5140
phil@mannlawgroup.com

John Whitaker, WSBA No. 28868
WHITAKER LAW GROUP
Seattle Tower
1218 Third Avenue, Suite 1809
Seattle, Washington  98101
(206) 436-8500
john@wlawgrp.com

Attorneys for Plaintiff ArrivalStar.

## CERTIFICATE OF SERVICE

I hereby certify that on the day indicated below, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties that have appeared in this matter.

Dated October 3, 2011.

                                                                   */s/ Philip P. Mann*